GEORGE A. MCCLELLAN AND THE METROPOLIS COMPANY, A CORPORATION, *Plaintiffs in Error*, v. CLAUDE L'ENGLE, *Defendant in Error*.

Opinion filed December 20, 1917.

1. A civil action for libel will lie when there has been a false and unprivileged publication, which exposes a person

to distrust, hatred contempt, ridicule or obloquy of which causes such person to be avoided, or which has a tendency to injure such person in his office, occupation, business or employment. If the publication is false and not privileged, and is such that its natural and proximate consequence necessarily causes injury to a person in his personal, social, official or business relations of life, wrong and injury are presumed or implied and such publication is actionable *per se.*

2. The language of a publication alleged to be libelous should be construed as the common mind would naturally understand it.

3. A libelous publication falsely and maliciously made is not privileged. The protection of the privilege may be lost by the manner of its exercise though the belief in the truth of the charge exist.

4. In an action to recover damages for a published libel, it is held on the facts of the case that there was reversible error in admitting testimony that the writer of the libellous article, an employee of the defendants, at a time and place when he was not acting within the scope of his employment, made statements that would indicate improper motives of the defendants in making the publication complained of.

Writ of Error to Circuit Court for Duval County, Daniel A. Simmons, Judge.

Judgment reversed.

*George C. Bedell,* for Plaintiffs in Error;

*Thos. B. Adams,* for Defendant in Error.

WHITFIELD, J.—A declaration herein contained four counts, the first three of which were eliminated on demurrers, leaving the fourth count, which is as follows:

McClellan et al. v. L'Engle—Opinion of Court.

"Comes now the plaintiff, Claude L'Engle, by his attorney, Thomas B. Adams, and sues George A. McClellan and The Metropolis Company, a corporation under the laws of the State of Florida, defendants:    *    *    *
"For that the plaintiff before and at the time of the committing by the defendants of the several grievances hereinafter mentioned, was a person of good name, credit and reputation, and deservedly enjoyed the esteem and good opinion of his neighbors and other good and worthy citizens of this State and of the United States, and the plaintiff was then and there a member of the House of Representatives of the United States Congress, having been duly elected to said office from the State of Florida at large; and the plaintiff was also then and there a Democratic candidate for nomination to said office from the Fourth Congressional District of Florida, at the Primary election to be held June 2nd, 1914; that on the 18th day of April, 1914, the defendant The Metropolis Company, a corporation under the laws of the State of Florida, was the publisher of a certain newspaper known and designed as The Florida Metropolis, which said newspaper was published in the City of Jacksonville, Duval County, Florida, by the defendant The Metropolis Company, and the said George A. McClellan was the editor of said newspaper; that at the time aforesaid, the said newspaper had a wide and extensive circulation in the State of Florida and elsewhere, particularly in said Fourth Congressional District, including the City of Jacksonville, Florida; that on the said April 18th, 1914, the defendants, well knowing the premises, but contriving wickedly and maliciously and intending to injure the plaintiff in his good name, fame and credit, and to bring him into contempt and ridicule before the people of

the State of Florida, and in particular before the Democratic electors of the said Fourth Congressional District, and in order to lessen the plaintiff's chances for nomination to said office from said Fourth Congressional District, did, on said April 18th, 1914, publish an editorial of said newspaper which was widely distributed throughout the State of Florida, and in particular throughout the said Fourth Congressional District, with the following head-lines:

### 'L'ENGLE A CAPITAL JOKE.'

that copy of said editorial is hereto attached, marked Exhibit B. and made a part thereof; that in and by said editorial, among other things, the defendants falsely and maliciously published of and concerning the plaintiff as a private citizen, and of and concerning the plaintiff in his said office as member of the House of Representatives, and of and concerning the plaintiff as candidate aforesaid, the following words, that is to say:

"'It's a disgrace that the real people of Florida should have to be shamed by the presence in Washington of such a clown and grandstand player,' meaning thereby that the plaintiff was regarded by the members of the House of Representatives and others in the capacity of a clown and grand-stand player; and that the plaintiff was not entitled to be respected by the members of that body, or by the people of Florida who had elected plaintiff to said office.

"And the defendants by the publication of said editorial falsely and maliciously published of and concerning the plaintiff in the capacities aforesaid, the words following, that is to say:

" 'He (meaning the plaintiff) has done absolutely nothing for Florida since he was sent to Washington;' thereby meaning that the plaintiff had not faithfully served and had not attempted to serve his constituents faithfully since the term of plaintiff's said office began, to-wit, on March 4th, 1913.

"And the defendants by the publication of said editorial falsely and maliciously published of and concerning the plaintiff in the capacities aforesaid, the words following, that is to say:

" 'He (meaning the plaintiff) was unable to vote intelligently in the caucas when the House (meaning the House of Representatives of the United States Congress) was organized, and had to have Frank Clark assist him, (meaning the plaintiff) and then he (meaning the plaintiff) turned around and threw verbal mud at his teacher;' thereby meaning that the plaintiff did not have sufficient intelligence to know what his duties were in caucus and to know what was proper action on his part.

"And the defendants by the publication of said editorial falsely and maliciously published of and concerning the plaintiff in the capacities aforesaid, the words following, that is to say:

" 'Ask any real Floridian who has visited the capital the last year (meaning the year 1913) and they will tell you that the fellow (meaning the plaintiff) is a joke and the laughing stock of the capital city official life;' thereby meaning that the Members of the House of Representatives and Senate of the United States Congress, and other officials connected with the United States Government, held the plaintiff up in ridicule and scorn and gave the plaintiff no consideration whatsoever.

"And the defendants by the publication of said editorial

falsely and maliciously published of and concerning the plaintiff in the capacities aforesaid, the words following, that is to say:

" 'It would be almost a crime to send him (meaning the plaintiff) back to continue to heap ridicule upon the State;' (meaning State of Florida), thereby meaning that the plaintiff was wholly incapable and incompetent to perform the duties of said office to which he had been duly elected, and for which he was seeking renomination; that the words quoted as aforesaid, with the inuendoes of the defendants as aforesaid, were false and malicious and were intended by the defendants to injure the plaintiff in his private character, and in his said office as Member of the House of Representatives of the United States Congress, and in his candidacy for nomination at the primary election as aforesaid, and were intended to work a loss of confidence in the plaintiff and to bring the plaintiff into contempt, scorn and ridicule among his neighbors and other good and worthy citizens of this and other States, and particularly among the Democratic electors of said Fourth Congressional District.

"Wherefore plaintiff sues and claims $100,000.00 damages."

The newspaper editorial referred to as Exhibit "B" is as follows:

" 'EXHIBIT B'

## "L'ENGLE A CAPITAL JOKE.

"Well, wouldn't it jar you? Claude L'Engle has had to get a bunch of reactionaries to give him a certificate that he was not hissed when he made his speech against the President on the free tolls repeal question. Champ Clark,

reactionary Democrat; Claude Kitchen, reactionary Democrat; James R. Mann, reactionary Republican and Republican floor leader; John J. Fitzgerald, reactionary Democrat, who voted with Cannon in the rules squabble before Cannon had his wings trimmed and notorious as a follower of the interests, and Walter M. Chandler a, Bull Mooser, who voted against the President, certify that Claude was not hissed and give him an immunity bath as the great unhissed turncoat from Florida, the one member of the Florida delegation to turn his back on the first Southern-born Democratic President since the war, and give aid and comfort to Willie Hearst and John R. Mc-Lean, the millionaire leaders of the reactionary faction, trying to humiliate the progressive President because they cannot lead him around by the nose in favor of their pet trust schemes.

"At last this political swashbucker whose venom is hurled over all who do not flatter or favor him has been unmasked. A consort with reactionaries he asks the progressives of Florida to return him to Congress to misrepresent them for another two years. It is a disgrace that the real people of Florida should have to be shamed by the presence in Washington of such a clown and grandstand player.

"L'Engle is engaged in the Barnum business, but is not wise enough to know that you can't foll 'em all the time. He has done absolutely nothing for Florida since he was sent to Washington. He was unable to vote intelligently in the caucus when the House was organized, and had to have Frank Clark assist him, and then turned around and threw verbal mud at his teacher. He was shunted away on the District of Columbia Committee, where all boasters are placed when they impudently try to tell Con-

gress how it should be conducted.    Ask any real Floridian who has visited the capital the last year and they will tell you that the fellow is a joke and the laughing stock of the capital city official life.

"It would be almost a crime to send him back to continue to heap ridicule upon the State."

To the fourth count a demurrer was interposed on the grounds "that the publication complained of does not support the inuendoes alleged in the count, and that said matter with such inuendoes as it does support is a privileged expression of opinion of and concerning the policy, capacity and fitness of a candidate for a representative position."

This demurrer was overruled, and the defendants pleaded (1) not guilty; (2) that the publication in said count complained of was without malice on the part of defendants or either of them, and was and is a fair comment upon the conduct of the plaintiff in his official capacity as a representative in the Congress of the United States."

Verdict and judgment for $10,000.00 damages were rendered, and the defendants took writ of error.

Errors are assigned on overruling the demurrer to the fourth count of the amended declaration, in admitting and in excluding evidence, in instructions given to the jury, in refusing requested instructions and in denying a new trial.    A ground of the motion for new trial is that the verdict is excessive.

A civil action for libel will lie when there has been a false and unprivileged publication, which exposes a person to distrust, hatred, contempt, ridicule or obloquy, or which causes such person to be avoided, or which has a tendency to injure such person in his office, occupation, business or employment. If the publication is false and not privileged,

and is such that its natural and proximate consequence necessarily causes injury to a person in his personal, social, official or business relations of life, wrong and injury are presumed or implied and such publication is actionable *per se*. Montgomery v. Knox, 23 Fla. 595, 3 South. Rep. 211; Jones v. Greeley, 25 Fla. 629, 6 South. Rep. 448; Ogden on Libel and Slander, 21; 25 Cyc. 243; Briggs v. Brown, 55 Fla. 417, 46 South. Rep. 325; Land v. Tampa Times Pub. Co., 68 Fla. 546, 67 South. Rep. 130; Stewart v. Codrington, 55 Fla. 327, 45 South. Rep. 809.

The language of a publication alleged to be libelous should be construed as the common mind would naturally understand it. · Jones, Varnum & Co. v. Townsend's Administratrix, 21 Fla. 431.

The first and fourth specifications of libellous matter stated in the fourth count of the amended declaration as set out above are that the defendants falsely and maliciously published of and concerning the plaintiff as a private citizen, and of and concerning the plaintiff in his office as member of the House of Representatives, and of and concerning the plaintiff as a candidate the following words "It is a disgrace that the real people of Florida should have to be shamed by the presence in Washington of such a clown and grandstand player," meaning thereby that the plaintiff was regarded by the members of the House of Representatives and others in the capacity of a clown and grandstand player, and that the plaintiff was not entitled to be respected by the members of that body, or by the people of Florida who had elected plaintiff to said office," and that the defendants falsely and maliciously published of and concerning the plaintiff in the capacities aforesaid, the words following, that is to say: " 'Ask any real Floridian who has visited the capital the

last year (meaning the year 1913) and they will tell you that the fellow (meaning the plaintiff) is a joke and the laughing stock of the capital city official life;' thereby meaning that the members of the House of Representatives and Senate of the United States Congress, and other officials connected with the United States Government, held the plaintiff up in ridicule and scorn and gave the plaintiff no consideration whatsoever."

The quoted language contained in a published article headed "L'Engle a Capital Joke," is susceptible to the meaning attributed to it, and, construed as the common mind would naturally understand it, the ordinary tendency of it is to engender in the average human mind an attitude of contempt and ridicule towards the plaintiff, the person referred to, and thereby to injure him in his private and official standing and business. This being the nature and tendency of the language which is alleged to have been "falsely and maliciously published," the allegations are sufficient to show the publication to be actionable *per se.* making unnecessary an allegation of special damages. Even if a jury on a proper issue made might well regard the language as being merely the writer's opinion, yet as the language in the connection used may be interpreted to have the meaning attributed to it in the declaration, a cause of action is stated, it being alleged that "the defendants falsely and maliciously published" the language with the meaning stated, which is held to be libellous *per se.* "A libellous publication falsely and maliciously made is not privileged. The protection of the privilege may be lost by the manner of its exercise though the belief in the truth of the charge exist." Jones, Varnum & Co. v. Townsend's Administratrix, 21 Fla. 431, text 456; Abraham v. Baldwin, 52 Fla.

151, 42 South. Rep. 591.    The language used may or may
not be, by a jury, considered a legally permissible publi-
cation concerning a legislative officer who is a candidate
for another term.          •

As the declaration considered   with   reference to the
quoted last specifications of language published states a
cause of action,   the other specifications   may be disre-
garded.    The demurrer to the fourth count was properly
overruled.

A cartoon also published in The Florida Metropolis on
April 1, 1914, seventeen days before the publication here
complained of, was, over objection from the complainant,
admitted in evidence as the court states on the "issue as
to whether or not the facts and circumstances surrounding
the publication of  the editorial  complained  of  in  the
declaration  were such  as to  refute  and  overcome  the
defendants' contentions that the publication complained of
was not malicious, and for no other purpose."    In view of
the plea that the publication complained of was without
malice and was and is a fair comment upon the conduct
of the plaintiff in his official capacity, it cannot be said
that the admission of the cartoon in  evidence was error,
since it tended to show  the attitude  of the  defendants
toward the plaintiff with  reference  to  his standing in
Washington, D. C., where he was as a member of Con-
gress.    But the whole of the cartoon  and  the reading
matter accompanying it should in fairness also have been
admitted, so the publication could have been considered
by the jury in its entirety.    The  cartoon contained a
caricature of a human face  on the  body  of an insect
labeled "Congressman L'Engle."    Other portions of the
cartoon and the reading matter accompanying the cartoon
are such that they may be regarded as having reference

to governmental affairs in which the plaintiff took part, and as such may be considered by the jury in determining the truth of the defendants' plea of justification, averring that the publication "was without malice."

It appears that the editorial containing the quoted language was written by a Mr. Connor, an editorial writer for "The Florida Metropolis," whose employment terminated May 20, 1914.

Over objection by the defendants, a witness was permitted to testify that on May 16, more than a month after the publication complained of, "Mr. Connor came into my office, and stated that he was passing along, and that he was merely paying a fraternal visit. I asked Mr. Connor why he didn't fight fair in politics. I accused him of writing this particular editorial. Mr. Connor says, 'I am working under orders and everything is fair in love, war and politics. We are going to beat your friend Claude. We have made up our mind to do it. It is in the game, and you would play it if you were in the same position that I was.' I took issue with him in a general way. Mr. Connor stayed probably 20 minutes, or half an hour. He was very pleasant. We discussed other things, but, bearing upon this particular editorial, why, he didn't admit that he wrote it, but he just simply used the pronoun in the plural, that 'we' were determined to beat him."

It does not appear that while "merely paying a fraternal visit" to the witness, Mr. Connor was engaged in or was acting within the scope of his employment in such a way as to make his statements binding on his employers, the defendants. There was error in admitting this testimony, and it was, in view of its nature and the result of the action, manifestly harmful to the defendants.

Rulings of the court properly excluded newspaper

articles printed in this State offered by the defendant since they tended to show that the palintiff as the author of such articles had ridiculed another official in Washington, D. C., and had no bearing on the issues made by the pleadings.

The issues were .whether the specified published language should be construed to mean that the plaintiff is regarded by his official associates and others as "a clown and grandstand player" not entitled to respect, and that the plaintiff's official associates and others held him in ridicule and scorn as "a joke and the laughing stock of the Capital City official life" as alleged, and whether the publication was without malice and was a. fair comment upon the conduct of the plaintiff in his official capacity, as averred in the special plea.

The fourth specification complained of, *viz*: "It would be almost a crime to send him (meaning the plaintiff) back to continue to heap ricidule upon the State," appears to be the expression of a mere opinion, and not necessarily damaging to the plaintiff. Charges given with reference to this specification and assigned as error need not be discussed, as this specification may be disregarded as an independent complaint.

The evidence was not of a nature to enlighten the jury as to whether the language complained of was used in the sense alleged in the declaration; and there is little, if any, direct evidence of injury.

The error in admitting incompetent testimony as indicated, doubtless enhanced the damages awarded.

Judgment reversed for a new trial.

Browne, C. J., and Taylor, Ellis and West, J. J., concur.